899 A.2d 867

**Logan Hamilton SWIFT**

v.

**STATE of Maryland.**

**No. 98, Sept. Term, 2005.**

Court of Appeals of Maryland.

June 2, 2006.

140

Stacy W. McCormack, Asst. Public Defender (Nancy S. Forster, Public Defender, on brief), for petitioner.

Kathryn Grill Graeff, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

RAKER, J.

The sole issue in this appeal is whether the trial court erred in denying petitioner's motion to suppress a controlled dangerous substance seized from him by the police. Petitioner Logan Hamilton Swift appeals the denial of his motion to suppress evidence of contraband obtained by the police. Because a reasonable person would not have felt free to leave under the circumstances in which the police officer encountered petitioner, and the police officer lacked any reasonable suspicion to stop petitioner, we shall hold that the Circuit Court for Wicomico County erred in denying petitioner's motion to suppress.

## I.

Swift was charged in the Circuit Court for Wicomico County in a criminal information with the following offenses: possession of a regulated firearm under the age of twenty-one in violation of Md.Code (1957, 1996 Repl.Vol., 2001 Cum.Supp.), Art. 27 § 445(e) [1]; wearing, carrying, or transporting a handgun upon his person in violation of Md.Code (2002, 2003 Cum.Supp.), § 4–203 of the Criminal Law Article; [2] possession

---

**1.** Art. 27 § 445(e) was repealed by 2003 Md. Laws Chap. 5, § 1, effective October 1, 2003, and is now re-codified, without substantive change, at Md.Code (2003, 2005 Cum.Supp.), § 5–133(d) of the Public Safety Article.

**2.** Unless otherwise noted, all subsequent statutory references herein shall be to Md.Code (2002, 2003 Cum.Supp.) of the Criminal Law Article.

of cocaine, a Schedule II CDS, with sufficient quantity to indicate an intent to distribute within a 1000 feet of a school in violation of § 5–627(a); possession of cocaine with intent to distribute in violation of § 5–602(2); and possession of cocaine in violation of § 5–601(c)(1).

Prior to trial, Swift filed a motion to suppress controlled dangerous substances that were seized from him,[3] and a handgun recovered by the police which was about an arm's length from Swift when he was arrested.[4] Deputy Dykes was the only witness to testify at the suppression hearing. The following facts were elicited. Deputy Jason Dykes was on routine patrol in a marked cruiser in Fruitland, Maryland, in the early morning hours of August 9, 2003. On that particular night, Deputy Dykes had not received any reports of criminal activity in the area. At approximately 3:13 a.m., Deputy Dykes was patrolling the area of Poplar Street and Elizabeth Street, an area he characterized as a high crime area with an open air drug market. While on patrol, he was wearing his uniform. He first saw Swift walking northbound on Poplar Street in the direction of Elizabeth Street. Deputy Dykes explained that he observed Swift probably three times, within

---

**3.** At the suppression hearing, defense counsel stipulated that contraband was found on Swift.

**4.** The only issue before this Court is the legality of the seizure of the controlled dangerous substance. At the motions hearing, the State challenged Swift's standing to object to the seizure of the handgun on the ground that it was abandoned property. Defense counsel advised the court that the defense agreed with the State that the gun was abandoned. Counsel stipulated that the firearm in question was abandoned and that defendant had no reasonable expectation of privacy in the handgun and the location from which it was seized. At the motions hearing, when the officer testified to the apprehension of Swift, the court sustained defense counsel's objection to any testimony as to the recovery of the handgun and the location of the gun at the time of the seizure.

Before this Court, in a footnote in his brief, petitioner states that in conceding that the handgun was abandoned, defense counsel misunderstood the law on abandonment. If petitioner believes that defense counsel erred below, petitioner is free to pursue that issue in a postconviction proceeding. The issue is not properly before this Court on this record.

three to five minutes, on Poplar Street and then on Elizabeth Street, and that Swift would look over his shoulder continually at him as he drove by. Swift was walking five feet from the edge of the pavement, walking into what would be the direction of oncoming traffic, if any.

Deputy Dykes stopped his cruiser about ten feet in front of Swift. Swift was walking down Elizabeth Street on his side of the road as the deputy drove up Elizabeth Street. At that time, Deputy Dykes stopped in front of Swift and got out of his car. He did not activate his emergency equipment or his siren, nor did he draw his weapon, but his headlights were on, and shining in the direction of Swift. Swift continued to walk toward the deputy's car, and the deputy, with his gun holstered, asked Swift for permission to talk with him "in order to perform a field interview stop" and obtain Swift's information. Deputy Dykes observed that Swift was wearing a black ball cap, a long white tee shirt that concealed his waistband, and blue jeans. The area was fairly dark, and the deputy and Swift were the only two individuals on the street. Deputy Dykes testified that Swift agreed to speak with him, and then explained his subsequent actions, as follows:

"[STATE]: What did you do after asking him to stop and talk to you?

[DEPUTY DYKES]: Asked him for ID, asked him for his information. He gave it to me. I called in a wanted check over the radio for him. At that time Officer Matt Brown with the Fruitland Police Department heard me call it in. Advised me over the radio that he was known for drugs and weapons.

[STATE]: Let me stop you there. How did you call in the warrant check to dispatch?

[DEPUTY DYKES]: Called in over my radio. I was standing outside the car with him, called in over my hand held radio, his name, date of birth, for a wanted check to see if he had any warrants on him.

[STATE]: While you were running that wanted check were you restraining him in any way?

[DEPUTY DYKES]: No. He was standing right with me, right in front of me, a couple of feet in front of me.

[STATE]: A couple feet between you and him?

[DEPUTY DYKES]: Yes.

[STATE]: What happened as you were waiting for the wanted check?

[DEPUTY DYKES]: Officer Matt Brown contacted me on the radio, advised me that he's known for drugs and weapons.

[STATE]: Who was he referring to?

[DEPUTY DYKES]: The Defendant, Mr. Swift. At that time, I acknowledged him.

[STATE]: Did he tell you what type of weapon he's known for?

[DEPUTY DYKES]: Guns, weapons. He told me, advised me he's known for CDS and guns."

Deputy Dykes explained that he used the pertinent police codes to complete the warrants check, and that he used an ear piece to receive transmissions from the dispatcher to prevent people from hearing the return transmissions. He asked Swift if he had any guns, knives, or drugs on him, and Swift said that he did not.[5] Swift informed Deputy Dykes that he was on his way home.

Deputy Dykes then asked Swift if he could search him. Swift did not reply to the deputy's request but took some money out of his pocket, and then put his hands on the hood of Deputy Dykes's car, which the deputy viewed as consent. Deputy Dykes testified as follows:

"The Defendant kind of threw his arms up in the air, put his hands on the hood of my car, I took that as consent. I went

---

5. On direct examination, Deputy Dykes testified that he received the results of the warrants check prior to seeking consent to search Swift, but on cross-examination, he testified that he did not receive word of the results of the check until "later on."

to put my flashlight away and went to pat him down at that time.

 * * *

"I went to secure my flashlight and approach him from behind to pat him down. At that time Mr. Swift pushed off from my hood and fled from me."

Deputy Dykes chased Swift, subsequently caught up with him, and arrested him. Officer Mark Perdue of the Fruitland Police Department arrived on the scene and searched Swift, recovering four individually wrapped, small bags of crack cocaine in Swift's pant leg and eighty dollars.

Prior to trial, Swift moved to suppress the evidence seized from him. Swift argued at the suppression hearing, that based on the totality of the circumstances, a reasonable person would not have felt free to leave, and thus he was detained illegally by the deputy.

The Circuit Court denied Swift's motion to suppress. The court ruled that under the facts of the case, a reasonable person would have felt free to leave, explaining as follows:

"Considering the totality of the circumstances what seems to me to be relevant is that there was one officer present. The officer was in uniform, he was in a marked patrol car. Although Mr. Swift came over to the police car, that was not as a result of any direction or order from the Deputy. The Deputy did not indicate to Mr. Swift that he was suspected of any crime.

"There's nothing from which I can conclude that the Deputy had any of Mr. Swift's documents. The Deputy said that he could not say categorically that he did not have an ID card. That seems to me to be something short of evidence that he did have it considering the testimony that his clear recollection is that he wrote the identification information down in his note pad.

"There's no indication of a display of weapon, of a tone of voice that would have indicated compliance with any request. There was no activation of emergency equipment. The encounter was a brief one, two to three minutes at most

between the initial encounter and the time when Mr. Swift left the scene.

"There is evidence and defense relied in part on the blocking of the Defendant's path by the patrol vehicle. And there are cases in Maryland and other jurisdictions where using a car in an aggressive manner to block a Defendant's path or control the direction or speed of his movement is evidence of a seizure. The case, at least one that I recall, is one where the Defendant was walking and the police pulled the car across the Defendant's path and blocked the Defendant. In this particular case the evidence is the Defendant was in the highway, in the traveled lane of the highway, in the lane in which the officer was properly traveling. And that seems to me to be a far different factual predicate than was the case in Jones versus State, which is one where the blocking of the movement was found to be an indicia of seizure.

"There was no frisk.

"And basically what I find to be under the totality of the evidence is that there was a voluntary encounter, an accosting, a field interview, whatever term you want to place on it, but it's one which I think a reasonable person under the facts of this case would have felt free to leave. And indeed the evidence is Mr. Swift did feel free to leave, he took off at a certain point.

"So considering those facts I'm going to deny the motion."

Swift proceeded to a trial before the court on a not guilty plea, agreed statement of facts. The court found Swift guilty of the handgun violations and the controlled dangerous substance charge. Swift was sentenced to a term of incarceration on both charges.

Petitioner noted a timely appeal to the Court of Special Appeals. In an unreported opinion, the court affirmed the judgment of the trial court denying the motion to suppress. The court held that because "Officer Dykes did not 'seize' Swift, even up to the point where Swift placed his hands on the patrol car as a show of consent, we have no occasion to

apply the Fourth Amendment to the facts of this case." Judge Meredith dissented. Concluding that no reasonable person in Swift's position would have felt free to ignore Deputy Dykes, and that any reasonable person in those particular circumstances would have felt constrained to wait for the results of the radio warrants check rather than simply ignore the deputy and walk away, petitioner had been seized without justification under the Fourth Amendment.

This Court granted Swift's petition for a writ of certiorari, to answer the following question:

"Whether an individual who is doing nothing other than walking down a public street at 3:00 a.m. is 'stopped' for the purposes of the Fourth Amendment when a police officer pulls his car directly in front of him, blocking his path, asks the individual for identification and detains him while running a warrant check."

*Swift v. State,* 390 Md. 284, 888 A.2d 341 (2005).

## II.

▮ The Fourth Amendment to the United States Constitution guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." The exclusion of evidence obtained in violation of these provisions is an essential part of the Fourth Amendment protections. *See Mapp v. Ohio,* 367 U.S. 643, 655–656, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081 (1961); *State v. Lee,* 374 Md. 275, 297–98, 821 A.2d 922, 934–35 (2003).

▮ It is well established that the Fourth Amendment guarantees are not implicated in every situation where the police have contact with an individual. *See California v. Hodari D.,* 499 U.S. 621, 625–26, 111 S.Ct. 1547, 1550–51, 113 L.Ed.2d 690 (1991); *Scott v. State,* 366 Md. 121, 133, 782 A.2d 862, 869 (2001). Many courts have analyzed the applicability of the Fourth Amendment in terms of three tiers of interaction between a citizen and the police. *See, e.g., United States v. Werking,* 915 F.2d 1404, 1407 (10th Cir.1990); *United States*

*v. Black*, 675 F.2d 129, 132–33 (7th Cir.1982), *cert. denied*, 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983); *Ferris v. State*, 355 Md. 356, 374 n. 5, 735 A.2d 491, 500 n. 5 (1999); *State v. Markland*, 112 P.3d 507, 509 n. 1 (Utah 2005); *Jefferson v. State*, 349 Ark. 236, 76 S.W.3d 850, 854–55 (2002); *Com. v. Sierra*, 555 Pa. 170, 723 A.2d 644, 646 n. 3 (1999); *Wilson v. State*, 874 P.2d 215, 219–20 (Wyo.1994). The most intrusive encounter, an arrest, requires probable cause to believe that a person has committed or is committing a crime. *See Florida v. Royer*, 460 U.S. 491, 499, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983); *Dunaway v. New York*, 442 U.S. 200, 207, 99 S.Ct. 2248, 2254, 60 L.Ed.2d 824 (1979). The second category, the investigatory stop or detention, known commonly as a *Terry* stop, is less intrusive than a formal custodial arrest and must be supported by reasonable suspicion that a person has committed or is about to commit a crime and permits an officer to stop and briefly detain an individual. *See Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984); *Ferris*, 355 Md. at 384, 735 A.2d at 506. A police officer may engage in an investigatory detention without violating the Fourth Amendment as long as the officer has a reasonable, articulable suspicion of criminal activity. *See Royer*, 460 U.S. at 498, 103 S.Ct. at 1324. A *Terry* stop is limited in duration and purpose and can only last as long as it takes a police officer to confirm or to dispel his suspicions. *See Ferris*, 355 Md. at 372–73, 735 A.2d at 499–500. A person is seized under this category when, in view of all the circumstances surrounding the incident, by means of physical force or show of authority a reasonable person would have believed that he was not free to leave or is compelled to respond to questions. Factors that might indicate a seizure include a threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person, the use of language or tone of voice indicating that compliance with the officer's request might be compelled, approaching the citizen in a nonpublic place, and blocking the citizen's path. *See Michigan v. Chesternut*, 486 U.S. 567, 575, 108 S.Ct. 1975, 1980, 100 L.Ed.2d 565 (1988); *United States v. Mendenhall*,

446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980); *cf. Royer,* 460 U.S. at 502–03, 103 S.Ct. at 1327.

 The least intrusive police-citizen contact, a consensual encounter, and the category at issue in this case, involves no restraint of liberty and elicits an individual's voluntary cooperation with non-coercive police contact. *See Mendenhall,* 446 U.S. at 553, 100 S.Ct. at 1876–77; *Werking,* 915 F.2d at 1408; *Black,* 675 F.2d at 133. A consensual encounter need not be supported by any suspicion and because an individual is free to leave at any time during such an encounter, the Fourth Amendment is not implicated; thus, an individual is not considered to have been "seized" within the meaning of the Fourth Amendment. *See Ferris,* 355 Md. at 373–74 n. 4, 735 A.2d at 500 n. 4.

 Encounters are consensual where the police merely approach a person in a public place, engage the person in conversation, request information, and the person is free not to answer and walk away. *See, e.g., Royer,* 460 U.S. at 497, 103 S.Ct. at 1324; *Mendenhall,* 446 U.S. at 553–54, 100 S.Ct. at 1876–77. The guarantees of the Fourth Amendment are not implicated in such an encounter unless the police officer has by either physical force or show of authority restrained the person's liberty so that a reasonable person would not feel free to decline the officer's requests or otherwise terminate the encounter. *Id.* at 554, 100 S.Ct. 1870; *see Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968). In *Ferris,* 355 Md. at 373 n. 4, 735 A.2d at 500 n. 4, we described a consensual encounter "as simply the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement official. Because an individual is free to leave at any time during such an encounter, he is not 'seized' within the meaning of the Fourth Amendment." (Citations omitted).

 Although there is no "litmus-paper test for distinguishing a consensual encounter from a seizure," the Supreme Court has made clear that "[l]aw enforcement officers do not violate the Fourth Amendment by *merely* approaching an

individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen . . ." *Royer*, 460 U.S. at 497, 506, 103 S.Ct. at 1324, 1329 (emphasis added). Consensual encounters, therefore, are those where the police *merely* approach a person in a public place, engage the person in conversation, request information, and the person is free not to answer and walk away. The request by a law enforcement officer to examine a person's identification does not, in and of itself, make an encounter non-consensual. *See INS v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984); *Royer*, 460 U.S. at 501, 103 S.Ct. at 1326. Neither does an officer's request to search an individual's belongings make an encounter *per se* non-consensual. *See Florida v. Bostick*, 501 U.S. 429, 435, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991); *Royer*, 460 U.S. at 501, 103 S.Ct. at 1326. Fourth Amendment protections are implicated, however, when an officer, by either physical force or show of authority, has restrained a person's liberty so that a reasonable person would not feel free to terminate the encounter or to decline the officer's request. *See Mendenhall*, 446 U.S. at 553–54, 100 S.Ct. at 1877. The United States Supreme Court explained in *California v. Hodari D.*, 499 U.S. at 626–27, 111 S.Ct. at 1550–51, that under the *Mendenhall* standard, seizure based on a show of authority does not occur unless the subject yields to the authority.

 An encounter has been described as a fluid situation, and one which begins as a consensual encounter may lose its consensual nature and become an investigatory detention or an arrest once a person's liberty has been restrained and the person would not feel free to leave. As the Supreme Court observed in *Terry*, 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16, "[w]hen the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen [we may] conclude that a 'seizure' has occurred." In determining whether the person has been seized, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have com-

municated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Bostick*, 501 U.S. at 437, 111 S.Ct. at 2387 (quoting *Michigan v. Chesternut*, 486 U.S. at 569, 108 S.Ct. at 1977).

In *Chesternut*, 486 U.S. at 575, 108 S.Ct. at 1980, Justice Blackmun identified examples of police conduct that would communicate to a reasonable person that he would not feel free to leave, including the activation of a siren or flashers, commanding a citizen to halt, display of weapons, and operation of a car in an aggressive manner to block a defendant's course or otherwise control the direction or speed of a defendant's movement. In *Ferris*, 355 Md. at 377, 735 A.2d at 502, we noted factors that courts have identified as probative of whether a reasonable person would feel free to leave, including the time and place of the encounter, the number of officers present and whether they were uniformed, whether the police removed the person to a different location or isolated him or her from others, whether the person was informed that he or she was free to leave, whether the police indicated that the person was suspected of a crime, whether the police retained the person's documents, and whether the police exhibited threatening behavior or physical contact that would suggest to a reasonable person that he or she was not free to leave. If a reasonable person would feel free to leave under the circumstances, however, then there has not been a seizure within the meaning of the Fourth Amendment. Applying these principles, we consider whether petitioner was seized within the meaning of the Fourth Amendment.

## III.

Petitioner argues that the trial court erred in denying the motion to suppress evidence because the police officer seized him within the meaning of the Fourth Amendment without reasonable grounds to believe that he had committed a crime. He concedes, correctly, that "a 'stop' for purposes of the Fourth Amendment does not occur every time a police officer stops a citizen and asks questions, even when the officer has no cause for doing so, so long as the citizen is free to end the

inquiry at any time." He argues that he was seized, for the purposes of the Fourth Amendment, when the police officer pulled his car directly in front of him, blocked his path and asked him for identification. Petitioner argues that the contact in this case was not consensual because he was walking alone on a public street at 3:13 a.m. when a marked police car that he had seen circling the block several times pulled up directly in front of him, and blocked his path. The officer got out of his car, and asked to speak with him. Petitioner contends that no reasonable person, under those circumstances, would have felt free to leave. Alternatively, petitioner argues that the consensual encounter ended when Deputy Dykes called in the warrants check.

The State maintains that there was no seizure implicating the Fourth Amendment where, as here, an officer approaches a citizen on the street and asks to speak with him, without any command or show of force, and the person agrees to speak with the officer and to provide identification. Taking this position, the State essentially concedes that there was no basis for a *Terry* stop and frisk.[6]

## IV.

Our review of the circuit court's denial of a motion to suppress is based on the record created at the suppression hearing. *See Whiting v. State,* 389 Md. 334, 345, 885 A.2d 785, 791 (2005); *Blake v. State,* 381 Md. 218, 230, 849 A.2d 410, 417 (2004). Review of the trial court's ruling on a motion to suppress evidence presents a mixed question of law and fact. *See Whiting,* 389 Md. at 345, 885 A.2d at 791. The trial court is in the best position to resolve questions of fact and to evaluate the credibility of witnesses. *See State v. Green,* 375 Md. 595, 607, 826 A.2d 486, 493 (2003). An appellate court reviews the trial court's findings of fact only for clear error, giving due weight to the inferences fairly drawn by the trial

---

6. The State does not argue before this Court, as it did before the Court of Special Appeals and the Circuit Court, that Deputy Dykes had reasonable suspicion to stop petitioner.

court. *Id.* The legal conclusions, however, are not afforded deference, and are reviewed *de novo*. *Ferris*, 355 Md. at 368, 735 A.2d at 497; *see also Ornelas v. United States*, 517 U.S. 690, 698–699, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996). The conclusion of the trial court as to whether a seizure has occurred for Fourth Amendment purposes is a question of law, reviewed *de novo* by this Court.

To resolve the question presented in this case and to determine whether the encounter between petitioner and Deputy Dykes was a consensual encounter or a seizure, we ask, considering all of the circumstances surrounding the encounter, would the conduct of the police "have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Chesternut*, 486 U.S. at 569, 108 S.Ct. at 1977. After a review of all the facts and circumstances of the case *sub judice*, we agree with petitioner, and the dissent in the Court of Special Appeals. In his dissent, Judge Meredith reasoned as follows:

"The implied requirement that Swift was to wait for the results of the warrant check adds weight to the other circumstances suggesting that Swift was not free to go about his business: Swift was accosted at 3:00 in the morning on an otherwise deserted street by a uniformed police officer who had blocked Swift's path with his marked police car and whose 'request' for a search was made under circumstances that would have made it difficult for any person to say 'no.'"

(Citations omitted). As to petitioner's submission to the officer's show of authority, Judge Meredith stated as follows:

"Here, the display of authority was the series of actions undertaken by Officer Dykes up to and including his query regarding outstanding warrants for Swift. Swift's submission is evidenced by his cooperation in the entire process, including waiting while Dykes asked dispatch whether to arrest Swift."

We agree with Judge Meredith and conclude that a reasonable person would not have felt free to leave the presence of the police officer and continue on his way home. Because a

reasonable person would have believed that he was not free to leave under the circumstances presented herein, we hold that petitioner was seized within the meaning of the Fourth Amendment.

Whether a reasonable person would have felt free to leave police presence is a highly fact-specific inquiry. As the Supreme Court pointed out in *Chesternut*, "[t]he test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." 486 U.S. at 573, 108 S.Ct. at 1979. The Court further emphasized that "what constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." *Id.*

Based upon the testimony of Deputy Dykes, we conclude that petitioner was seized within the meaning of the Fourth Amendment. We cannot conclude that a reasonable person would have felt free to walk away under all of the circumstances surrounding this encounter. Indeed, Deputy Dykes made clear that petitioner was not free to leave as evidenced by his testimony that when petitioner was leaning against the car and he pushed off the vehicle to leave, petitioner was not free to go because "I was not done, as I stated in the cross there that the wanted check had not come back yet and due to Officer Matt Brown advising me that he's known for CDS and weapons, that I pursued after him."

The facts in this record indicate that the interaction between petitioner and Deputy Dykes was in the nature of constructive restraint rather than a consensual encounter. The time of night of the encounter, the officer's conduct before he approached petitioner, the blocking of petitioner's path with the police cruiser, headlights shining on petitioner, the officer's testimony that he was conducting an investigatory field stop, and the warrants check, taken together, lead us to conclude that petitioner was seized. After seeking permission from Swift to question him, Deputy Dykes requested petitioner's identification information and initiated a warrants check.

Merely asking for identification does not create a seizure. Nor does a warrants check necessarily convert a consensual encounter into a detention or a seizure. A warrants check, however, is a circumstance that must be viewed in light of all of the other facts surrounding the encounter between Deputy Dykes and petitioner.

Although petitioner was not restrained physically when Deputy Dykes asked for his identification, once petitioner complied with his request and Deputy Dykes then ran the warrants check, a reasonable person would not have felt free to leave. Deputy Dykes described the initial contact as follows:

> "I exited my vehicle. Exited my vehicle, asked him it if was okay if I talked to him, to get some information from him, *to perform a field interview stop*. And he agreed, he stopped, talked to me, gave me his information."

Although Deputy Dykes never told petitioner that he was free to leave, that factor does not, in and of itself, determine that a seizure has occurred; however, it is a factor that we consider within the totality of the circumstances analysis as to whether he was in fact seized. *See United States v. Drayton*, 536 U.S. 194, 206–07, 122 S.Ct. 2105, 2113, 153 L.Ed.2d 242 (2002); *Mendenhall*, 446 U.S. at 558–59, 100 S.Ct. at 1879; *Ferris*, 355 Md. at 379–80, 735 A.2d at 503; *see also Royer*, 460 U.S. at 503, 103 S.Ct. at 1327 (observing, in determining whether a seizure occurred, that "Royer was never informed that he was free to board his plane if he so chose, and he reasonably believed that he was being detained").

We note that the individual components of the encounter between Deputy Dykes and petitioner, considered in isolation, may not be indicative of a seizure. The Fourth Amendment does not prevent an officer from approaching an individual and seeking permission to ask a few questions. An officer may ask a person for identification. And simply conducting a warrants check does not create a seizure. But we must heed the clear direction of the Supreme Court, "that any assessment as to whether police conduct amounts to a seizure implicating the Fourth Amendment must take into account all

of the circumstances surrounding the incident in each individual case." *Chesternut*, 486 U.S. at 572, 108 S.Ct. at 1979 (citations and internal quotations omitted). Under the circumstances presented herein, we conclude that petitioner yielded to the authority of the police and did not voluntarily consent to Deputy Dykes's requests.

The Circuit Court erred in failing to suppress the controlled dangerous substance seized from petitioner.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AS TO THE CONVICTION FOR WEARING, TRANSPORTING, OR CARRYING A HANDGUN AFFIRMED. JUDGMENT OF THE COURT OF SPECIAL APPEALS AS TO THE CONVICTION FOR POSSESSION OF CONTROLLED DANGEROUS SUBSTANCE REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR WICOMICO COUNTY AS TO THE CONVICTION FOR POSSESSION OF CONTROLLED DANGEROUS SUBSTANCE. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY WICOMICO COUNTY.*