REPORTED

IN THE COURT OF SPECIAL APPEALS
OF MARYLAND

No. 0897

September Term, 2014

ANDREW J. PYON

v.

STATE OF MARYLAND

Kehoe,
Friedman,
Moylan, Charles E., Jr.
 (Retired, Specially Assigned),

JJ.

Opinion by Moylan, J.

Filed: April 6, 2015

Should the Fourth Amendment be implicated in this case, it was not satisfied. The dispositive threshold question before us, therefore, is whether the Fourth Amendment was even implicated. An encounter between a law enforcement official and a private citizen is a phenomenon that is, like Caesar's Gaul, divided into three parts. Such encounters, of course, actually cover a wide spectrum embracing infinite factual variations. For purposes of Fourth Amendment analysis, however, that wide spectrum has been conveniently sectioned off into three constitutional categories, two of which involve the Fourth Amendment and one of which does not. Before we presume to examine the specimen at hand, we must be sure we are using the proper microscope. It behooves us briefly to survey the respective microscopes.

## Three Levels of Police-Citizen Encounters

As a teaching aid, the 24-karat opinion is <u>Swift v. State</u>, 393 Md. 139, 899 A.2d 867 (2006). Judge Raker, 393 Md. at 149-51, there set out the three levels on which a police-citizen encounter may occur.

> "It is well established that the Fourth Amendment guarantees are not implicated in every situation where the police have contact with an individual. ... Many Courts have analyzed the applicability of the Fourth Amendment in terms of three tiers of interaction between a citizen and the police. ... The most intrusive encounter, an arrest, requires probable cause to believe that a person has committed or is committing a crime. ... The second category, the investigatory stop, is less intrusive than a formal custodial arrest and must be supported by reasonable suspicion that a person has committed or is about to commit a crime and permits an officer to stop and briefly detain an individual.
>
> ...

"The least intrusive police-citizen contact, a consensual encounter, ... involves no restraint of liberty and elicits an individual's voluntary cooperation with non-coercive police contact."

(Citations omitted).

## An Arrest of the Person

The most coercive of the police-citizen encounters is that involved when the officer actually places the citizen under arrest. Self-evidently the Fourth Amendment applies and self-evidently the Fourth Amendment must be satisfied. The Fourth Amendment justification required for such a severe Fourth Amendment seizure of the person has always been nothing less than probable cause. Swift v. State, 393 Md. at 150. The Supreme Court spoke of the standard in Dunaway v. New York, 442 U.S. 200, 208, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979):

"The standard of probable cause thus represented the accumulated wisdom of precedent and experience as to the minimum justification necessary to make the kind of intrusion involved in an arrest 'reasonable' under the Fourth Amendment."

See also Florida v. Royer, 460 U.S. 491, 499, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

The present case does not remotely involve this highest level of police-citizen encounter. During that phase of the encounter pertinent to our present analysis, the appellant was clearly not under arrest and the issue of probable cause as a justification is utterly immaterial. Our exclusive concern is with the lower two levels of police-citizen encounter.

## A <u>Terry</u> Stop (An Investigative Stop)

The intermediate level of police-citizen encounter is generally referred to as a <u>Terry</u> stop (from the seminal "stop and frisk" case of <u>Terry v. Ohio</u>, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)), although frequently it is described as an "investigative stop." It is a lesser Fourth Amendment intrusion than a full-scale arrest. Because it is a Fourth Amendment intrusion upon a citizen's otherwise unfettered freedom, however, it accordingly requires a Fourth Amendment justification, albeit a lesser justification than is required for an arrest. <u>Swift</u>, 393 Md. at 150, described both its coercive attributes and its required justification:

> "<u>A police officer may engage in an investigatory detention</u> without violating the Fourth Amendment <u>as long as the officer has a reasonable, articulable suspicion of criminal activity</u>. ... A <u>Terry</u> stop is limited in duration and purpose and can only last as long as it takes a police officer to confirm or to dispel his suspicions. ... <u>A person is seized under this category when</u>, in view of all the circumstances surrounding the incident, by means of physical force or show of authority <u>a reasonable person would have believed that he was not free to leave or is compelled to respond to questions. Factors that might indicate a seizure include a threatening presence of several officers</u>, the display of a weapon by an officer, some physical touching of the person, the use of language or tone of voice indicating that compliance with the officer's request might be compelled, approaching the citizen in a nonpublic place, <u>and blocking the citizen's path</u>."

(Emphasis supplied) (citations omitted).

The above two levels of police-citizen encounter involve, respectively, greater and lesser Fourth Amendment seizures of the person. Both levels, therefore, require Fourth

Amendment justification in order to qualify as reasonable, probable cause in the one case and <u>Terry</u>-level reasonable articulable suspicion in the other.

### A Mere Accosting (A Consensual Encounter)

A mere accosting, by dramatic contrast, falls below the Plimsoll line of Fourth Amendment applicability. It is simply the police-citizen subset of the voluntary and consensual social intercourse that occurs regularly between citizen and citizen. It is beneath the Fourth Amendment radar. If one citizen may approach another and engage in conversation, a police officer is self-evidently free to do no less. Lest he attract the scrutiny of the Fourth Amendment, however, he must be careful to do no more. <u>Swift</u>, 393 Md. at 151, described this sub-constitutional level of police-citizen encounter:

> "Encounters are consensual where the police merely approach a person in a public place, engage the person in conversation, request information, and the person is free not to answer and walk away. <u>The guarantees of the Fourth Amendment are not implicated in such an encounter</u> unless the police officer has by either physical force or show of authority restrained the person's liberty <u>so that a reasonable person would not feel free to decline the officer's requests or otherwise terminate the encounter</u>."

(Emphasis supplied) (citation omitted).

In <u>Ferris v. State</u>, 355 Md. 356, 373 n.4, 735 A.2d 491 (1999), the Court of Appeals had similarly described the consensual encounter as:

> "[S]imply <u>the voluntary cooperation of a private citizen in response to non-coercive questioning</u> by a law enforcement official. <u>Because an individual is free to leave at any time during such an encounter, he is not 'seized' within the meaning of the fourth amendment</u>."

(Emphasis supplied) (citations omitted).

- 4 -

In Graham v. State, 146 Md. App. 327, 366, 807 A.2d 75 (2002), this Court spoke in a similar vein:

> "The classic Supreme Court opinions explicating the phenomenon of accosting are Immigration and Naturalization Service v. Delgado, 466 U.S. 210, 104 S. Ct. 1758, 80 L.Ed. 2d 247 (1984); Florida v. Royer, 460 U.S. 491, 103 S. Ct. 1319, 75 L.Ed.2d 229 (1983); and United States v. Mendenhall, 446 U.S. 544, 100 S. Ct. 1870, 64 L.Ed.2d 497 (1980). From the beginning, the accosting cases undertook to disabuse bench and bar of the notion that the police need special Fourth Amendment justification even to approach and to talk to citizens. There has never been a suggestion that a police officer enjoys a greater than ordinary right to approach and talk. The message, rather, is that the police officer enjoys no less a right."

(Emphasis supplied).

It is, moreover, clear that a mere accosting or consensual encounter, should it stay scrupulously within its limits, does not implicate the Fourth Amendment and does not, therefore, require any Fourth Amendment justification. See, Swift, 393 Md. at 151.

## A Border Line Is Not a Border Zone

The present case lies perplexingly close to the line between the Terry-stop and the mere accosting. That line is in this case the dispositive boundary between Fourth Amendment applicability and Fourth Amendment inapplicability. It is frequently, as it is in this case, a line that can be factually ambiguous. Nonetheless, it is a line and not a zone. The Fourth Amendment is either applicable or inapplicable. There is no halfway. The State will not, therefore, be heard to say, "Even if we lacked full Terry-level reasonable suspicion, we had some suspicion. We came close. Therefore, it was not unreasonable to enjoy at least some police prerogatives beyond the ordinary, even if not the full complement thereof." In

- 5 -

a decision that must, of doctrinal necessity, be binary, the Fourth Amendment applies either in full measure or not at all. Except in horseshoes, close does not count.

The threshold of Fourth Amendment applicability, moreover, is a legal question calling for a de novo determination. As to it, we are not deferential.

As we straddle this elusive border between a mere accosting and an investigative stop, we encounter a not uncommon instance of police behavior that seeks to exploit the benefits of being on both sides of the border at the same time. We spoke of this creative shape-shifting in Graham v. State, 146 Md. App. 327, 337, 807 A.2d 75 (2002):

> "[T]here emerges with unmistakable clarity a picture of a police procedure that is ... a wolf in sheep's clothing. The innocuous surface trappings are all those of a mere accosting, something long sanctioned by the Supreme Court as an everyday occurrence that does not even catch the eye of the Fourth Amendment. The underlying reality, however, is a borderline investigative procedure whereby the police seek to enjoy the full Fourth Amendment benefits of ... a Terry-stop ... without paying the attendant Fourth Amendment dues."

(Emphasis supplied).

## The Conviction

On May 28, 2014, the appellant, Andrew J. Pyon, was convicted in the Circuit Court for Howard County in a non-jury trial of the unlawful possession of less than 10 grams of marijuana. He was ordered to pay a fine of $500.

The conviction was for a violation of Maryland Code, Criminal Law Article, § 5-601, which prohibits, inter alia, the possession of a controlled dangerous substance. Marijuana is a controlled dangerous substance. Chapter 193 and 194 of the Acts of 2012, effective as

of October 1, 2012, were the controlling law at the time of the appellant's initial stop by the police and at the time of the appellant's trial. The then-new provision had reduced the maximum penalty for the possession of less than 10 grams of marijuana from imprisonment for one year and/or a fine of $1,000 to a maximum imprisonment of 90 days and a maximum fine of $500.[1]

The laboratory report introduced into evidence showed that the bag of plant material recovered from the glove compartment of the vehicle in which the appellant was a passenger contained 3.37 grams of marijuana. Notwithstanding the relative lack of gravity of the conviction before us, the Fourth Amendment issue will be examined as if we were reviewing a conviction for murder in the first degree.

### The Contentions

The appellant raises the following two contentions:

1. that the trial judge erroneously denied his motion to suppress the marijuana seized from the glove compartment of the car in which he was a passenger; and

2. that the evidence was not legally sufficient to support the conviction for possession of marijuana.

---

[1] Section 5-601 has since been amended by ch. 158, of the Acts of 2014, effective October 1, 2014, and now provides that for a first violation of the section, the use or possession of less than 10 grams of marijuana is "a civil offense punishable by a fine not exceeding $100." Section 5-601.1 also provides that the police shall issue a citation for such a violation rather than arrest the violator.

## The Suppression Motion

In this case, we are not dealing with a self-contained suppression hearing but rather with a suppression motion in the context of the trial itself. In reviewing that ruling, we will confine our examination to the evidence and argument bearing on the motion to suppress, just as, had there been a pre-trial suppression hearing, we would confine ourselves to the evidence and argument offered at that hearing.

The only witness to testify on the motion to suppress was Officer Sally Kimmett of the Howard County Police Department. On the very early morning of Friday, December 14, 2013, Officer Kimmett was on duty in her marked police cruiser. From the radio dispatch operator, she received a call to proceed to the vicinity of 6518 Overheart Lane in East Columbia. She did so and arrived there within less than 10 minutes. She placed her reception of the call from "dispatch" at approximately 11 minutes after midnight.

We will pass over (but just for the moment) the substance of the dispatch call that sent Office Kimmett to the neighborhood of 6518 Overheart Lane and focus exclusively on what she saw and did upon her arrival at that location. Officer Kimmett saw and first focused upon a gray Honda SUV that was unoccupied. She then noticed a second Honda in the general area and re-directed her attention to it. It is that second Honda that concerns us in this case. It was parked and its engine was off.

As Officer Kimmett, in her marked police cruiser, approached the second parked Honda, it is clear that she maneuvered her cruiser in such a way as to block, at least partially, any potential egress by the Honda. The geography, however, is a trifle ambiguous:

"[DEFENSE COUNSEL]: And where did you park?

"A.    The co-Defendant's vehicle was parked in and I came around, there's a circle there and I came around and I came up this way. So it was I would say [cater-corner].

"Q.    So you were directly behind them?

"A.    No.

"Q.    This is them parked in and this would be me coming around the circle and parking here.

"[THE STATE]: For the record indicating if we're looking at a clock face, 4:00, 5:00.

"A.    That's correct.

"Q.    So it's your testimony that if they wished to, the co-Defendant could have left the parking lot?

"A.    They could have backed out, that's correct."

(Emphasis supplied).

Any further inquiry about backing out was short-circuited:

"Q.    Okay, in your opinion were they free to leave at that the time that you approached their vehicle?

"[THE STATE]:     Objection, her opinion's irrelevant.

"THE COURT:     Sustained."

It was also clear that Office Kimmett got out of her cruiser and walked quickly toward the Honda just as the driver began to get out of the Honda.

"Q. Did you – how did you approach the vehicle?

"A. I walked up to it.

"Q. And in what manner did you approach quickly, slowly?

"A. The driver began to get out so I approached quickly because I wasn't sure what he was going to do."

(Emphasis supplied).

Office Kimmett requested the driver to produce his driver's license.

"Q. Did you say anything to him?

"A. Not that I recall besides can I have your driver's license.

"Q. And you were by yourself at this point?

"A. That's correct."

(Emphasis supplied).

The driver of the Honda was the appellant's ultimate co-defendant, James Chinham. To that point, Officer Kimmett had noted nothing to indicate the presence or use of marijuana (or of any other criminal activity).

"Q. And when you first approached my client's – or I'm sorry, the co-defendant's vehicle, you didn't see anybody smoking marijuana?

"A. No.

"Q. You didn't see any fire or anybody lighting anything?

"A.    No.

"Q.    And when you approach the vehicle you didn't notice any smoke that was present?

"A.    Not that I recall."

(Emphasis supplied).

It was as she was examining Chinham's driver's license that Officer Kimmett first observed the appellant sitting in the right front passenger seat of the Honda. Her instinctive response was to call for "back-up."

"Q.    Where did Officer James Wintjen come from?

"A.    I had requested back up when I observed that there were multiple subjects in the vehicle.

"Q.    And where were you when you called for the back up?

"A.    I called for the back up once I had gotten Mr. Chinham's ID and saw that there was someone else in the vehicle.

"Q.    You did this by your mobile communication on your person rather than one in the car, correct?

"A.    That's correct, yes.

"Q.    How long did it take Officer James Wintjen to approach? Or to get to the scene?

"A.    Not very long at all, I don't remember an exact time."

(Emphasis supplied).

Once Office Wintjen had arrived on the scene, Officer Kimmett walked around to the front passenger's window and asked the appellant to produce his driver's license or other identification.[2]

As the appellant then handed his license to Officer Kimmett, she testified that she detected the odor of raw marijuana coming from the passenger's side of the vehicle.

"Q.     What conversation or what did you do concerning [the appellant]?

"A.     I again asked him for – or <u>I asked him for his driver's license</u>.

"Q.     And did he give it to you?

"A.     He did.

"Q.     <u>As he gave you his driver's license, did anything occur that triggered your training</u>?

"A.     <u>Yes</u>.

"Q.     <u>What was that</u>?

"A.     <u>I detected an odor of marijuana</u>.

"Q.     <u>Where was the odor of marijuana coming from</u>?

"A.     <u>The vehicle</u>.

"Q.     <u>Do you know what part of the vehicle</u>?

---

[2]The record does not reveal whether the passenger window, as Officer Kimmett approached it, was open or closed. From the fact that the encounter under review took place at shortly after midnight in the middle of December (plus the lack of evidence that anyone in the car had been smoking), an inference would seem to have been permissible that the window was closed. In any event, the burden was on the State to justify warrantless activity.

"A.     The passenger compartment.

"Q.     Where were you standing when you smelled the odor of marijuana?

"A.     Next to the passenger's side of the vehicle."

(Emphasis supplied).

Officer Kimmett ordered the appellant to get out of the car. Both the appellant and Chinham were ordered to stand on the sidewalk as both officers conducted a warrantless Carroll-Doctrine search of the Honda.[3] From the glove compartment, they recovered the baggie containing what turned out to be 3.37 grams of marijuana.

## Bracketing the Target

Our concern in this case is with a very narrow window of time. Our focus is on the status of the encounter between Officer Kimmett, on the one hand, and the appellant and Chinham, on the other, between the moment that Officer Kimmett parked her cruiser cater-corner to the Honda and the moment that she detected the smell of marijuana emanating from the passenger side of the vehicle. The significance of what happened before and what happened afterward is not subject to serious dispute. Our exclusive concern is whether, during that brief interval, we are looking at a Terry-stop, subject to Fourth Amendment

---

[3]Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925) held that a warrantless search of an automobile is reasonable if the police have probable cause to believe that evidence of a crime will be found in the automobile. What is now universally called the Carroll-Doctrine is one of the classically recognized exceptions to the warrant requirement.

conditions, or at a voluntary and consensual exchange of conversation free of all such barnacles.

Before zeroing in on that ultimate target, however, it behooves us briefly to dispose of the "before" and the "after," pointing out why neither is the occasion for any serious dispute.

## No Fourth Amendment Justification

First, the "before." In terms of what Officer Kimmett knew as she parked her police cruiser cater-corner to the Honda in which the appellant was seated, it is beyond dispute that she had no Terry-level reasonable suspicion that the Honda and its occupants had committed, were then committing, or were about to commit any crime generally or any traffic offense specifically. Absent that predicate, there was no basis for any Fourth Amendment intrusion of the most minimal sort.

In terms of a traffic offense, there was no evidence that the Honda had even been driving, let alone evidence that it had been involved in any traffic infraction. For all we know, the Honda was legally parked and its two occupants were sitting quietly inside it. There was, moreover, no evidence of any structural defect – no excessively tinted windows, no hanging tail pipe, no loose or missing license tag, etc. As far as the traffic laws were concerned, the Honda and its occupants were clean. As far as more generic crimes were concerned, the Honda and its occupants were also untouchable.

If the Honda and its occupants were subjected to any official restraint, the Fourth Amendment was thereby implicated. The Fourth Amendment fountainhead, of course, is Terry v. Ohio. At the most fundamental level, the gears of the Fourth Amendment are engaged "whenever a police officer accosts an individual and restrains his freedom to walk away[.]" 392 U.S. at 16.

Ornelas v. United States, 517 U.S. 690, 696, 116 S.Ct. 1657, 135 L.Ed.2d 911 (1996), described the reasonable suspicion standard that must be satisfied to justify such restraint:

> "We have described reasonable suspicion simply as 'a particularized and objective basis' for suspecting the person stopped of criminal activity[.]"

United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), was emphatic not only about the Terry standard but about the fact that it applies to all seizures of the person, including those involved in brief investigatory stops.

> "The Fourth Amendment applies to seizures of the person, including brief investigatory stops such as the stop of the vehicle here. An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."

(Emphasis supplied) (citations and footnote omitted).

United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), described the standard for a Terry-stop:

> "The officer, of course, must be able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch."' [Terry v. Ohio, 392 U.S. 1] at 27, 88 S.Ct., at 1883. The Fourth Amendment requires 'some minimal level of objective justification' for making the stop."

- 15 -

(Citation omitted). The question is whether Officer Kimmett had any <u>Terry</u>-level justification as she first approached the Honda.

## A Worthless Tip Pointing In The Wrong Direction

What had been communicated to Officer Kimmett's mind as she drove to 6518 Overheart Lane that night was sketchy in the extreme. The so-called radio dispatch was of "drug activity in the area." Officer Kimmett then knew absolutely nothing about the provenance of the tip:

"[DEFENSE COUNSEL]: Why were you asked to go there?

"A.     We received a call for drug activity in the area.

"Q.     <u>Do you know where that call came from</u>?

"A.     <u>I'm not sure the exact person</u> but it came through Howard County Dispatch.

"Q.     <u>Did you get the name of the person who reported the call?</u>

"A.     <u>I did not</u>."

(Emphasis supplied).

The Supreme Court has made it abundantly clear that an anonymous tip, unverified by independent police observation, is not a credible basis for a Fourth Amendment intrusion. The tip that was dismissed as woefully inadequate in <u>Florida v. J.L.</u>, 529 U.S. 266, 271, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), was no more insubstantial than the one given to Officer Kimmett in this case:

"The tip in the instant case lacked the moderate indicia of reliability present in <u>White</u> and essential to the Court's decision in that case. <u>The anonymous call</u> concerning J.L. <u>provided no predictive information and</u> therefore, <u>left the police without means to test the informant's knowledge or credibility</u>. That the allegation about the gun turned out to be correct does not suggest that the officers, prior to the frisks, had a reasonably basis for suspecting J.L. of engaging in unlawful conduct: <u>The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search</u>. <u>All the police had to go on in ths case was the bare report of an unknown, unaccountable informant who neither explained how he knew</u> about the gun <u>nor supplied any basis for believing he had inside information</u> about J.L. If <u>White</u> was a close case on the reliability of anonymous tips, this one surely falls on the other side of the line."

(Emphasis supplied). See generally, <u>Carter v. State</u>, 143 Md. App. 670, 678-80, 795 A.2d 790 (2002).

The tip in this case, moreover, was twice bereft. For starters, it was without a shred of credibility. Quite aside from that fatal flaw, it did not even point to the appellant or to James Chinham or to the Honda in which they were sitting. The tip mentioned two black males in a Toyota Corolla. When Officer Kimmett arrived at the scene, there was no Toyota Corolla there. If it had been there, it was gone. The tip also mentioned a gray Honda SUV, but said nothing with respect to it. Officer Kimmett saw a Honda SUV at the scene that she believed was the one mentioned in the tip, but it was unoccupied. Her testimony about the tip and her arrival at the scene was:

"Q.  Officer, <u>when you first got that call to service, it was a call about two black males in a Toyota Corolla</u>?

"A.  Correct.

"Q.  And <u>also about</u> a silver – I'm sorry, <u>a gray Honda SUV</u>, correct?

- 17 -

"A.     Correct.

"Q.     And when you got to the scene <u>you observed that same Honda SUV but it was unoccupied</u>, correct?

"A.     <u>Correct</u>."

(Emphasis supplied).

Officer Kimmett redirected her focus to the Honda in which the appellant was sitting essentially on the basis of nothing but guesswork. Whereas the tip, moreover, had expressly referred to two black males, the appellant was Asian American. The Honda itself was "kind of a hybrid" and "appeared that it may have been an SUV." Was it or was it not an SUV? The record does not tell us. The best that Officer Kimmett could offer was that "perhaps the caller got it wrong."

"Q.     Okay, so it wasn't actually my client's car that was part of the description for the call to service?

"A.     Not necessarily, the client or it wasn't your client's car, it was <u>Mr. Chinham's car</u>, <u>which is I believe kind of a hybrid</u> and <u>it appeared that it may have been an SUV</u>. <u>Perhaps the caller got it wrong</u>.

"Q.     But there was a gray Honda SUV in the proximity?

"A.     That's correct, yes."

(Emphasis supplied). If, indeed, "the caller got it wrong," is Officer Kimmett then competent to confect an alternate dispatch fleshed out by her own imagination?

In sum total, that was not so much as an "inchoate hunch," let alone a <u>Terry</u>-level reasonable and articulable suspicion. Our conclusion, therefore, is that if the Fourth

- 18 -

Amendment is implicated, that is, if the police-citizen encounter was a <u>Terry</u>-stop rather than a mere accosting, the Fourth Amendment was not remotely satisfied and the physical evidence should have been suppressed. The State recognizes this as surely as do we. The heart of its argument is:

> "The least intrusive police-citizen contact, a consensual encounter ... involves no restraint of liberty and elicits an individual's voluntary cooperation with non-coercive police contact. Encounters are consensual where the police merely approach a person in a public place, engage the person in conversation, request information, and the person is free not to answer and walk away. <u>A consensual encounter need not be supported by any suspicion and because an individual is free to leave at any time during such an encounter, the Fourth Amendment is not implicated; thus, an individual is not considered to have been 'seized' within the meaning of the Fourth Amendment</u>."

(Emphasis supplied). The State's argument is that we are dealing with a mere accosting.

### All in the Same Boat

As part of our "before" analysis, of course, it would not necessarily be fatal to the State's case that the Fourth Amendment was in a general sense implicated when Officer Kimmett parked her police cruiser cater-corner to the Honda and approached the driver to ask for identification. The State might still challenge the appellant's Fourth Amendment standing. The appellant, after all, was a mere passenger (or sedentary occupant) in the Honda and it might be further necessary to establish that he, as well as James Chinham (the driver), had been seized within the contemplation of the Fourth Amendment.

<u>Brendlin v. California</u>, 551 U.S. 249, 127 S.Ct. 1400, 168 L.Ed.2d 132 (2007) mercifully relieves us of all uncertainty on that score. In a unanimous opinion, the Supreme

- 19 -

Court held unequivocally that when an automobile is stopped within the contemplation of the Fourth Amendment, not only has the driver been subjected to a Fourth Amendment seizure of his person but all of the passengers in the vehicle have similarly been seized. Justice Souter's opinion for the Court was sure:

> "The law is settled that in Fourth Amendment terms a traffic stop entails a seizure of the driver 'even though the purpose of the stop is limited and the resulting detention quite brief.' ... And although we have not, until today, squarely answered the question whether a passenger is also seized, we have said over and over in dicta that <u>during a traffic stop an officer seizes everyone in the vehicle, not just the driver</u>. See, <u>e.g.</u>, ... <u>Whren [v. United States</u>, 517 U.S. 806,] 809-10, 116 S.Ct. 1769[, 135 L.Ed.2d 89 (1996)] ('<u>Temporary detention of individuals during the stop of an automobile by the police</u>, even if only for a brief period and for a limited purpose, <u>constitutes a "seizure" of "persons" within the meaning of [the Fourth Amendment</u>]')."

(Emphasis supplied) (citations omitted).

In <u>Brendlin</u>, the police had no adequate justification to stop the vehicle. The Supreme Court of California had held, however, that the unconstitutional stop of the vehicle and driver did not constitute a stop of the passenger. The United States Supreme Court emphatically disagreed.

> "<u>The State</u> concedes that the police had no adequate justification to pull the car over ... but <u>argues that the passenger was not seized and thus cannot claim that the evidence was tainted by the an unconstitutional stop</u>. We resolve this question by asking whether a reasonable person in Brendlin's position when the car stopped would have believed himself free to 'terminate the encounter' between the police and himself. We think that <u>in these circumstances any reasonable passenger would have understood the police officers to be exercising control to the point that no one in the car was free to depart without police permission</u>."

551 U.S. at 256-57. (Emphasis supplied) (citation omitted).

- 20 -

Arizona v. Johnson, 555 U.S. 323, 332, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009), reaffirmed the Brendlin holding:

"Brendlin held that a passenger is seized, just as the driver is, 'from the moment [a car stopped by the police comes] to a halt on the side of the road.' A passenger therefore has standing to challenge a stop's constitutionality."

(Citations omitted). See also, Pennsylvania v. Mimms, 434 U.S. 106, 111, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); Maryland v. Wilson, 519 U.S. 408, 413, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997).

If the Fourth Amendment was violated by the prolonged detention of the Honda in this case, the appellant, as one of its occupants, had unquestionable Fourth Amendment standing to raise the suppression issue.

## Sir Isaac Newton and Traffic Stops

There might arguably be a second impediment to proceeding with a Fourth Amendment analysis. The argument might be made that cases involving the stopping of an automobile, along with its driver and its passengers, are inapposite because in this case the police never actually "stopped" the Honda but simply approached it after it was already stopped. We see no Fourth Amendment difference, however, between bringing a moving vehicle to a stop in the first instance and potentially prolonging a stop already in progress in the second instance.

According to the laws of Newtonian physics, one may distinguish between 1) a body in motion coming to rest when acted upon by a force and 2) a body already at rest remaining

at rest when acted upon (perhaps redundantly) by a force. According to Fourth Amendment law, by contrast, the two phenomena are indistinguishable, if the force in question is a police officer and if the body acted upon is an automobile. Constitutionally, it is a distinction without a difference. In either scenario, the automobile and all of its occupants are immobilized. As a linguistic convenience, we will in this opinion use the term "stop" to refer to the force or show of authority that results in an already stopped vehicle remaining stopped as well as to the force or show of authority that results in a moving vehicle coming to a halt.

The State in its brief seeks to distinguish an automobile passenger in a car that is moving from a passenger in an automobile that is not in any sense moving.

"Based on these facts, the motions court made an explicit determination that Officer Kimmett 'didn't stop that car, she was just walking towards that car,' and 'it's clear that the officer was approaching that vehicle that had already stopped.'"

As long as the passenger is presently being restrained by force or show of authority, we see no doctrinal significance in whether he had theretofore been moving or not. The defendant in Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), was in a posture similar to the one occupied by the appellant in this case. The defendant there was seated in the right front-passenger seat of a car that was legally parked at 2:15 a.m. in a "high crime area" of Bridgeport, Connecticut. The police sergeant who was approaching the vehicle had been told by a reliable informant that the defendant had a loaded revolver in his waistband.

"After calling for assistance on his car radio, Sgt. Connolly approached the vehicle to investigate the informant's report. Connolly tapped on the car window and asked the occupant, Robert Williams, to open the door. When Williams rolled down the window instead, the sergeant reached into the car and removed a fully loaded revolver from Williams' waistband."

407 U.S. at 145. (Emphasis supplied).

The Supreme Court found the ultimate "Terry-frisk" to have been reasonable. Because a justifiable Terry-stop is an indispensable antecedent to the legitimacy of a subsequent Terry-frisk, however, it was necessary to find that there had, indeed, been an antecedent "stop", notwithstanding the fact that the defendant had not been moving. Justice Rehnquist analyzed Sergeant Connolly's approach to the seated defendant in terms of its having been a "brief stop."

"A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time."

407 U.S. at 146.  The Supreme Court held that there had been a reasonable "forcible stop" as the necessary predicate for the subsequent frisk.

"So long as the officer is entitled to make a forcible stop,[1] and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose.

"[1]Petitioner does not contend that Williams acted voluntarily in rolling down the window of his car."

407 U.S. at 146. (Emphasis supplied).

In his dissenting opinion, Justice Brennan also analyzed Sergeant Connolly's approach to the seated defendant as a "forcible stop."

> "The crucial question on which this case turns, as the Court concedes, is whether, there being no contention that Williams acted voluntarily in rolling down the window of his car, the State had shown sufficient cause to justify Sgt. Connolly's 'forcible' stop."

407 U.S. at 151 (Brennan, J., dissenting) (emphasis supplied).

Ferris v. State, 355 Md. 356, 735 A.2d 491 (1999), is a precise case in point. It involved, as in this case, the detention of a motorist who was already stopped rather than the stopping of a motorist who was then moving. To be sure, there had been an earlier traffic stop on the highway but that stop had officially been terminated and a fresh analysis began at ground zero. Ferris, who at that point was free to leave, was seated behind the steering wheel of his parked vehicle when the second police–citizen encounter, calling for a separate analysis, began.

> "[B]ecause the traffic stop had ended there, Ferris was lawfully free to drive away, as Trooper Smith himself acknowledged in his own testimony. ...
>
> "The more difficult question we must answer in this case is whether Trooper Smith's questioning of Petitioner after he had issued the traffic citation and had returned the driver's license and registration documents constituted a detention, and hence raises any Fourth Amendment concerns, or was merely a 'consensual encounter,' thus implicating no constitutional overview."

355 Md. at 373-374. (Emphasis supplied) (citations and footnotes omitted).

Both Munafo v. State, 105 Md. App. 662, 673-75, 660 A.2d 1068 (1995) and Snow v. State, 84 Md. App. 243, 248-49, 578 A.2d 816 (1990), also involved situations wherein second and independent analyses had to be made of the Fourth Amendment detention of

- 24 -

motorists in cars that were already fully stopped before the circumstances calling for fresh analysis even came into play.

Indeed, if the Fourth Amendment applies to a passenger in a moving vehicle, on the one hand, and to a pedestrian on the street, on the other hand, it is not exempted from applying to a passenger (or occupant) of a stationary car at some intermediate point between the two more familiar applications. There is no eye in the hurricane of Fourth Amendment applicability. If the constructive "stop" of the Honda did not pass constitutional muster in this case, the appellant was properly positioned to raise that issue. As we have already held, moreover, if the Fourth Amendment was, indeed, implicated, it was not satisfied. All that remains to be determined is whether we are dealing with a Terry-stop (an investigative stop), so as to implicate the Fourth Amendment, on the one hand, or a mere sub-constitutional accosting (a consensual encounter), on the other.

## The Proof of Guilt Was Legally Sufficient

Before finally zeroing in on the ultimately dispositive question of the status of the police-citizen encounter in this case, it is convenient to complete the "before and after" analysis. Assuming, arguendo, that there had been no Fourth Amendment violation up to the moment when Officer Kimmett first detected the smell of raw marijuana, the conviction would in that case be unassailable. It is well-settled law that the smell of marijuana by a trained drug-smelling dog can establish the probable cause necessary for a warrantless Carroll-doctrine search of an automobile. Illinois v. Caballes, 543 U.S. 405, 125 S.Ct. 834,

160 L.Ed.2d 842 (2005). See also, <u>Wilkes v. State</u>, 364 Md. 554, 586-87, 774 A.2d 420 (2001); <u>State v. Ofori</u>, 170 Md. App. 211, 221-24, 906 A.2d 1089 (2006); <u>Carter v. State</u>, 143 Md. App. 670, 674, 795 A.2d 790 (2002); <u>State v. Funkhouser</u>, 140 Md. App. 696, 711, 782 A.2d 387 (2001). Although a much rarer phenomenon, the human smell of raw marijuana has the same evidentiary impact as does the canine smell. <u>Johnson v. United States</u>, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948); <u>Ford v. State</u>, 37 Md.App. 373, 379, 377 A.2d 577 (1977) ("We have no doubt ... that knowledge gained from the sense of smell alone may be of such character as to give rise to probable cause for a belief that a crime is being committed in the presence of the officer.").

In this case, Officer Kimmett testified that she was trained to detect the smell of raw marijuana and that she smelled it as she stood by the open window at the front passenger door of the Honda. The trial judge, as was his fact-finding prerogative, believed Officer Kimmett's testimony. His finding in that regard, therefore, was not clearly erroneous. Armed with the necessary probable cause, the two officers conducted a warrantless <u>Carroll</u>-doctrine search of the Honda and found a baggie of what turned out to be marijuana in the glove compartment.

The appellant, to be sure, was only one of the two persons in the car, and the appellant was not the driver. The evidence, nonetheless, was legally sufficient to support a permissible inference that the appellant and the driver were in joint constructive possession of the marijuana. <u>Maryland v. Pringle</u>, 540 U.S. 366, 124 S.Ct. 795, 157 L.Ed.2d 769

(2003), was decided by a unanimous Supreme Court. The defendant Pringle was a front-seat passenger in a car stopped by the police in Baltimore County, Maryland that was then searched by them. From the glove compartment, immediately behind which Pringle had been sitting, the police recovered $763 in cash. From between a back seat armrest and the back seat, the police recovered five glassine baggies of cocaine. In the car in addition to Pringle was the driver and another passenger who had been sitting in the back seat. Each of the three occupants denied any knowledge of the cocaine.

The Court of Special Appeals affirmed the trial judge's denial of Pringle's suppression motion. 141 Md. App. 292, 785 A.2d 790 (2001). A divided Court of Appeals reversed, holding that the evidence was not sufficiently particularized to point to Pringle who was a mere passenger. Pringle v. State, 370 Md. 525, 805 A.2d 2016 (2002). The Supreme Court in turn reversed the Court of Appeals. Chief Justice Rehnquist, 540 U.S. at 372, wrote for the Supreme Court:

> "We think it an entirely reasonable inference from these facts that any or all three of the occupants had knowledge of, and exercised dominion and control over, the cocaine. Thus, a reasonable officer could conclude that there was probable cause to believe Pringle committed the crime of possession of cocaine, either solely or jointly."

(Emphasis supplied).

In looking at this issue of legal sufficiency, we are resolving the appellant's second contention in the State's favor. Should the argument be made that the second contention would be moot if the first contention is decided in the appellant's favor and the conviction

- 27 -

reversed, we hasten to point out that issue of legal sufficiency would not necessarily be moot because of possible double jeopardy implications. It is always possible that, notwithstanding a reversal, the State might wish to try the appellant again. Should the reversal of the conviction be based only on a procedural flaw in the trial, the State would be fully entitled to proceed with a retrial. State v. Ball, 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896). Should the reversal, on the other hand, be based, even in part, on the legal insufficiency of the proof of guilt, double-jeopardy principles would bar a retrial. Burks v. United States, 437 U.S. 1, 95 S.Ct. 2141, 57 L.Ed.2d 1(1978). It would not be so barred in this case.

To the further possible argument that if we held that the marijuana should have been suppressed, that it should not, therefore, figure in the legal sufficiency computation, we hasten to respond that that is not the case. Lockhart v. Nelson, 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988) made it very clear that an appellate court, reviewing the legal sufficiency of evidence at a trial, must weigh sufficiency on the basis of all the evidence that was actually admitted and not simply the evidence that was determined, in hindsight, to have been properly admitted. The Supreme Court explained, 488 U.S. at 40-42:

> "It is quite clear from our opinion in Burks that a reviewing court must consider all of the evidence admitted by the trial court in deciding whether retrial is permissible under the Double Jeopardy Clause – indeed, that was the ratio decidendi of Burks, ... and the overwhelming majority of appellate courts considering the question have agreed.
>
> "The basis for the Burks exception to the general rule is that a reversal for insufficiency of the evidence should be treated no differently than a trial court's granting a judgment of acquittal at the close of all the evidence. A trial court in passing on such a motion considers all of the evidence it has admitted,

and to make the analogy complete it must be this same quantum of evidence which is considered by the reviewing court."

(Emphasis supplied) (citation and footnote omitted).

The evidence in this case was legally sufficient to support the conviction, and the State has the option, should it decide to pursue it, to seek a retrial.

## The Generative Rationale of a Mere Accosting

We now return to the question that we have thus far deferred, that of whether this was a mere accosting or a <u>Terry</u>-stop. All encounters between a police officer and a citizen do not rise to the level of Fourth Amendment notice. This was recognized as early as <u>Terry v. Ohio</u>, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968):

> "Obviously, <u>not all personal intercourse between policemen and citizens involves 'seizures' of persons</u>. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."

(Emphasis supplied).

What has now come to be the universally recognized dividing line between the police-citizen encounters that implicate the Fourth Amendment and those that do not is Justice Stewart's statement for the Court in <u>United States v. Mendenhall</u>, 446 U.S. 544, 553-54, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980):

> "We adhere to the view that a person is 'seized' only when, by means of force or a show of authority, his freedom of movement is restrained. <u>Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards. The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry</u>, but 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy

and personal security of individuals.' <u>As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy</u> as would under the Constitution require some particularized and objective justification.

...

"We conclude that <u>a person has been 'seized' within the meaning of the Fourth Amendment only if</u>, in view of all the circumstances surrounding the incident, <u>a reasonable person would have believed that he was not free to leave</u>."

(Emphasis supplied) (citations and footnote omitted).

<u>Florida v. Royer</u>, 460 U.S. 491, 502, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), spoke

to the same point:

"[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions."

<u>Florida v. Bostick</u>, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), made

it clear, however, that a mere accosting can lose its initially consensual character and thereby

engage the gears of the Fourth Amendment:

"Our cases make it clear that a <u>seizure does not occur simply because a police officer approaches an individual and asks a few questions.</u> So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required. <u>The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature.</u>"

(Emphasis supplied) (citations omitted).

Immigration and Naturalization Service v. Delgado, 466 U.S. 210, 215, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984), also affirmed that the circumstances surrounding a police-citizen encounter can transform it from one that is voluntary and consensual into one implicating the Fourth Amendment:

> "What has evolved from our cases is a determination that <u>an initially consensual encounter</u> between a police officer and a citizen <u>can be transformed into a seizure</u> or detention <u>within the meaning of the Fourth Amendment</u>, '<u>if</u>, in view of all the circumstances surrounding the incident, <u>a reasonable person would have believed that he was not free to leave</u>.'"

(Emphasis supplied) (citations omitted).

In <u>Swift v. State</u>, 393 Md. 139, 152, 899 A.2d 867 (2006), Judge Raker confirmed that a police-citizen encounter is a "fluid situation" that can readily begin as a consensual encounter but then escalate into a <u>Terry</u>-stop as accumulating indications of domineering police behavior are added to the equation.

> "<u>An encounter</u> has been described as a fluid situation, and one <u>which begins as a consensual encounter may lose its consensual nature and become an investigatory detention</u> or an arrest once a person's liberty has been restrained and the person would not feel free to leave."

(Emphasis supplied).

The reason for recognizing a police officer's prerogative to ask questions of citizens is clear. The officer is a citizen as well as an officer. He enjoys the same rights as do other citizens. In his concurring opinion in <u>Terry v. Ohio</u>, 392 U.S. at 32, Justice Harlan wrote of "the liberty (again, possessed by every citizen) to address questions to other persons[.]" In

his separate concurring opinion, Justice White, 392 U.S. at 34, referred to the same general

right inhering in all citizens:

> "<u>There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets</u>. Absent special circumstances, the person approached may not be detained or frisked but may refuse to cooperate and go on his way."

(Emphasis supplied).

This Court spoke to this very point in <u>Graham v. State</u>, 146 Md. App. 327, 366, 807

A.2d 75 (2002):

> "From the beginning, the accosting cases undertook to disabuse bench and bar of the notion that the police need special Fourth Amendment justification even to approach and to talk to citizens. <u>There has never been a suggestion that a police officer enjoys a greater than ordinary right to approach and talk. The message, rather, is that the police officer enjoys no less a right</u>. The officer possesses the same privilege as anyone else to approach a stranger and to ask, 1) 'What time is it?', 2) 'How do I get to Camden Yards?', or 3) 'Would you like to buy a ticket to the Policeman's ball?'"

(Emphasis supplied). To that extent, the police officer is not disenfranchised.

Our analytic point of departure is that a police officer, in talking to people, enjoys the

same prerogative as does every other citizen, neither more nor less. He enjoys no special or

additional authority arising out of the fact that he is a police officer. The fundamental

character of a mere accosting is that it is egalitarian and not authoritarian. The citizen

addressed is free to ignore the officer and to walk away. If the citizen does not feel free to

do so, the encounter, by definition, loses its character as a voluntary and consensual one.

This parity between the officer and the ordinary citizen may be helpful to remember when

we assess, on an <u>ad hoc</u> basis, whether an officer on a given occasion may have strayed beyond the boundaries of a mere accosting.

> "<u>Both parties to such mutual and voluntary exchanges stand as equals of each other</u>. <u>Neither is in a dominant role</u>. It is inconceivable that one civilian would ever approach another and ask, 'Can you tell me how to get to Camden Yards, and, by the way, would you mind if I frisk you before you begin to tell me?' It is inconceivable that one civilian would approach another and ask, 'Can you, please, tell me what time it is and, by the way, would you mind sitting down there on the curb before you tell me? I don't want you suddenly to run away.'"

146 Md. App. at 366. (Emphasis supplied).

### To Run with the Hare and Hunt with the Hounds

Particularly in the unsettled borderland of police-citizen encounters, the police, quite understandably, would like to enjoy the prerogatives of Fourth Amendment authority without having to pay their Fourth Amendment dues. They naturally want the best of all possible worlds. They desire, simultaneously, to run with the hare and hunt with the hounds.

The issue in this case is clear. From the moment that Officer Kimmett first parked her police cruiser cater-corner to the rear of the Honda to the time that she received the appellant's driver's license at the front passenger window, were the Honda and its occupants being subjected to an investigative stop or were Officer Kimmett and the two young men simply engaging in a mutually voluntary and consensual conversation? The State maintains that the encounter was only the latter and that the young men's compliance with the officer's direction was simply voluntary consensual behavior. The State's argument, therefore, is that the Fourth Amendment does not even apply.

- 33 -

The litmus test is indisputably that of whether the appellant and James Chinham during this critical period of time would or would not have felt free to leave. More precisely of course, the test is not whether the appellant and Chinham subjectively felt free to leave, but whether, under those circumstances, a reasonable person would, objectively, have felt free to leave. No single factor is dispositive in one direction or the other. The objective appraisal must be made by looking at the totality of the circumstances.

The appraisal made in Ferris v. State, 355 Md. at 373-84, is a good model to follow. For the critical appraisal in Ferris, the police wished to enjoy the relaxed and Fourth Amendment-free atmosphere of a voluntary and consensual encounter but the Court of Appeals held that the confrontation was, in fact, a coercive one. The Court, 355 Md. at 377, catalogued some of the innumerable factors that might enter into such an appraisal.

> "Although the inquiry is a highly fact-specific one, courts have identified certain factors as probative of whether a reasonable person would have felt free to leave. These factors include: the time and place of the encounter, the number of officers present and whether they were uniformed, whether the police removed the person to a different location or isolated him or her from others, whether the person was informed that he or she was free to leave, whether the police indicated that the person was suspected of a crime, whether the police retained the person's documents, and whether the police exhibited threatening behavior or physical contact that would suggest to a reasonable person that he or she was not free to leave."

(Emphasis supplied) (citation omitted).

Swift v. State, supra, was also a case wherein the State sought the benefit of a "mere accosting" modality but where the Court of Appeals overruled the trial court and the Court of Special Appeals and held that the police-citizen encounter was a coercive one calling for

- 34 -

Fourth Amendment justification. The opinion of the Court, 393 Md. at 152, gave its description of the dividing line between the two modalities.

> "Consensual encounters, therefore, are those where the police *merely* [emphasis in original] approach a person in a public place, engage the person in conversation, request information, and the person is free not to answer and walk away. ... Fourth Amendment protections are implicated, however, when an officer, by either physical force or show of authority, has restrained a person's liberty so that a reasonable person would not feel free to terminate the encounter or to decline the officer's request."

## A. The Blocking of the Honda By the Police Cruiser

In terms of "whether the police exhibited threatening behavior," it is hard to characterize Officer Kimmett's initial vehicular approach as anything other than aggressive and intimidating. As an overture to a friendly and mutually consensual conversation, why not park quietly and unobtrusively behind the Honda and against the curb? To position the police cruiser cater-corner to the rear of the Honda, thereby blocking at least partially its egress, would thereby say something to a reasonable person about his freedom to leave. If that freedom to leave was not obliterated, it was at least compromised.

That is simply not the discreet way for a party wishing to engage in conversation with another party to approach the encounter. It was, to say the least, aggressive and assertive behavior. It was indisputably an unfriendly gesture. Our job is to assess, objectively, what such behavior would have said to a reasonable person about Officer Kimmett's intentions.

Swift v. State, 393 Md. at 153, referenced Michigan v. Chesternut, 486 U.S. 567, 575, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988), in identifying one of the coercive factors as

the "operation of a car in an aggressive manner to block a defendant's course or otherwise control the direction or speed of a defendant's movement."

## B. The Time and Place of the Encounter

The confrontations in the present case and in <u>Ferris</u> were, in terms of time and place, completely unlike the confrontations in <u>Florida v. Royer</u>, 460 U.S. at 493-94, and <u>United States v. Mendenhall</u>, 446 U.S. at 555, which took place in broad daylight in the middle of busy concourses of major airports. In holding that the encounter in <u>Ferris</u> was an investigative stop and not a mere accosting, the Court of Appeals considered as a significant factor that the encounter took place at "1:30 a.m. on a dark, rural interstate highway." The opinion noted:

> "The situation faced by Ferris was markedly different from that of a person passing by or approached by law enforcement officers on the street, in a public place, or inside the terminal of a common carrier."

355 Md. at 378. The Court of Appeals, 355 Md. at 383, went on:

> "Finally, we note the geographic and temporal environment of the encounter: <u>late at night on the side of a presumably desolate, rural interstate highway</u>. The time and location of the encounter would have been unsettling to a reasonable person in Ferris's position. Consequently, <u>the physical environment of the encounter</u> between Trooper Smith and Ferris <u>heightened the coerciveness of the encounter</u>."

(Emphasis supplied).

In <u>Michigan v. Chesternut</u>, 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988), the Supreme Court also spoke of this factor:

- 36 -

"[W]hat constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs."

(Emphasis supplied).

The time and place of the encounter was also a factor in Swift v. State, 393 Md. at 155. The Court of Appeals there quoted with approval from the dissenting opinion of Judge Meredith when the case was before the Court of Special Appeals.

"Swift was accosted at 3:00 in the morning on an otherwise deserted street by a uniformed officer who had blocked Swift's path with his marked police car and whose 'request' for a search was made under circumstances that would have made it difficult for any person to say 'no'."

(Emphasis supplied).

The confrontation in this case took place shortly after midnight on a lonely residential street apparently with no other persons abroad in the neighborhood. It was a circumstance that could well have been more threatening than reassuring. It may not have been a dispositive factor in and of itself, but it was nonetheless a piece of the larger mosaic.

## C. The Number of Uniformed Officers

Ferris took note of the fact that in that roadside encounter, "there were two uniformed officers present." 355 Md. at 378-79.  The Court of Appeals, 355 Md. at 383, further noted, "the presence of two uniformed law enforcement officers increased the coerciveness of the encounter." (Emphasis supplied). In this case, once Officer Wintjen arrived on the scene, there were also two officers at the scene, both in uniform. At that point, moreover, there were presumably two marked police cruisers on the scene. The accumulation of officers and

vehicles might well have suggested to a reasonable citizen that he was not free to walk or drive away without police permission. One can only conjecture what Officer Kimmett would have done in this case had either Chinham or the appellant, without a word, presumed to walk or drive away.

## D. The Peremptory Request for Driver's Licenses

After partially blocking the Honda with her police cruiser, Officer Kimmett immediately approached Chinham as he was alighting from his vehicle and asked him to produce his operator's license. That would be a completely appropriate procedure, of course, following a legitimate investigative stop, but it is hardly a conducive introduction to a request for mutually consensual conversation. As a request for a truly voluntary conversation, one would expect an, "Excuse me," or a, "Pardon me for interrupting, but I would like to ask you a few questions if you are willing to talk to me." It is very difficult for us to conceive that an objective observer would view Officer Kimmett's request that Chinham produce his driver's license as a prelude to a consensual conversation. Officer Kimmett's approach to Chinham contrasts sharply with the more genteel approach of the officers in <u>Florida v. Royer</u>, 460 U.S. at 493-94, which the Supreme Court held to have been proper, at least at that early stage of the <u>Royer</u> encounter.

> "As Royer made his way to the concourse which led to the airline boarding area, <u>the two detectives approached him</u>, <u>identified themselves as policemen</u> working out of the sheriff's office, <u>and asked if Royer had a 'moment' to speak with them</u>; <u>Royer said 'Yes.'</u>"

(Emphasis supplied).

- 38 -

As part of an actual investigative stop, even a demand (let alone a request) for identification would be appropriate. Short of a <u>Terry</u>-stop, however, the police are not permitted to ask for a driver's identification. <u>Delaware v. Prouse</u>, 440 U.S. 648, 663, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) made this very clear:

> "[E]xcept in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, <u>stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment</u>."

(Emphasis supplied).

The peremptory request to see the driver's license in this case was essentially indistinguishable from the behavior of the stopping officer in <u>Swift v. State</u>, who upon stopping Swift asked him for ID. Upon receiving the ID, the officer immediately got on the police radio and checked for outstanding warrants. The Court of Appeals, 393 Md. at 149, again alluded to Judge Meredith's dissent as he noted the essentially confrontational character of the request for ID and the warrant check.

> "Judge Meredith dissented. Concluding that <u>no reasonable person in Swift's position would have felt free to ignore Deputy Dykes</u>, and that <u>any reasonable person in those particular circumstances would have felt constrained to wait for the results of the radio warrants check rather than simply ignore the deputy and walk away</u>, [he noted that] <u>petitioner had been seized without justification under the Fourth Amendment</u>."

(Emphasis supplied).

The request for identification, as <u>Swift v. State</u> noted, 393 Md. at 157, is a pertinent factor in the coercion equation:

"<u>Merely asking for identification does not create a seizure</u>. Nor does a warrants check necessarily convert a consensual encounter into a detention or a seizure. <u>A warrants check</u>, however, <u>is a circumstance that must be viewed in light of all of the other facts surrounding the encounter</u> between Deputy Dykes and petitioner."

(Emphasis supplied).

Officer Kimmett had no justification for asking to see the driver's license of either Chinham or the appellant. Her behavior constituted a Fourth Amendment seizure of their persons without any Fourth Amendment justification for such a seizure.

## E. A Traffic Stop Can Be <u>Per</u> <u>Se</u> Intimidating

Every action taken by Officer Kimmett in this case indicated that she was following routine police procedures for the conduct of a traffic stop or other investigative stop. She positioned her cruiser <u>vis-á-vis</u> the Honda as would be done in a traffic stop. She approached the driver and asked for his license just as would be done in a routine traffic stop.

As we now assess the level of the encounter and the effect that it might objectively have on the mind of a reasonable citizen subjected to such a stop, the Supreme Court's observation in <u>Berkemer v. McCarty</u>, 468 U.S. 420, 436, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), about the impact of a traffic stop is enlightening:

"<u>[A] traffic stop significantly curtails the 'freedom of action' of the driver and the passengers</u>, if any, <u>of the detained vehicle</u>. Under the law of most States, it is a crime either to ignore a policeman's signal to stop one's car or, once having stopped, to drive away without permission. <u>Certainly few motorists</u>

would feel free either to disobey a directive to pull over or to leave the scene of a traffic stop without being told they might do so."

(Emphasis supplied) (citation and footnotes omitted).

All of the Supreme Court cases that describe the right of an officer to ask questions of a citizen without implicating the Fourth Amendment immediately hasten to add that the citizen is equally free to decline to answer the question or simply to ignore the question and to walk away. As Officer Kimmett approached Chinham in this case and asked for his driver's license, it is inconceivable that Chinham would have felt free to respond, "It is none of your business," to have turned on the Honda's ignition switch, and to have started to drive away. Without such a feeling of freedom, however, he was "seized" for Fourth Amendment purposes, and so was the appellant.

Although the State now contends on appeal, as it did at trial, that the encounter in this case was nothing but a mere accosting with no accompanying Fourth Amendment baggage, we note, in defense of Officer Kimmett's behavior, that she never seemed to be engaging in what she believed to be a voluntary and consensual encounter but behaved, rather, as if she was engaged in a full-blown Fourth Amendment-implicated traffic stop or other investigative stop from start to finish. That is, moreover, the message that would, objectively speaking, have been reasonably understood by a reasonable man. The State's present position that this was a mere accosting seems to have been an afterthought for trial purposes.

Office Kimmett behaved precisely as a well-trained officer should in the conduct of a traffic stop or other investigative stop. In that context, her actions were proper. Her only problem is that she had no Fourth Amendment justification for conducting a <u>Terry</u>-stop sanctioned by the Fourth Amendment. Conduct that is impeccable in making a traffic stop may, it must be stressed, be completely inappropriate when the officer is presuming to engage in a voluntary and consensual mere accosting. Unlike in the case of easements in real property law, there is in a mere accosting no dominant position and no servient position. Both parties are equal. In this case, however, Officer Kimmett's role was definitely the dominant one, as the appellant and Chinham were definitely cast in servient roles.

## F. Informing a Citizen of the Right to Leave

In holding that Ferris had been subjected to a full-blown <u>Terry</u>-stop and not to a mere accosting, the Court of Appeals also gave weight to the fact that the stopping officer had never informed Ferris that he was free to depart. Such advice is not required but whether it is given or not is nonetheless one of the factors to be considered as part of the totality. The Court of Appeals observed:

> "[F]ollowing the conclusion of the underlying traffic stop, <u>Trooper Smith never informed Ferris that he was free to depart</u>. ... '"[K]nowledge of the right to refuse consent is one factor to be taken into account"' in determining the voluntariness, and thus constitutional validity of a defendant's purported consent. Consequently, <u>an officer's failure to advise a motorist that he or she could refuse, or was free to leave, remains a factor to be considered</u>."

355 Md. at 379-80. (Emphasis supplied) (citations and footnote omitted).

Swift v. State, 393 Md. at 157, also noted that the failure of the police to advise a

citizen that he is free to leave is very definitely a factor in the larger analysis:

> "Although Deputy Dykes never told petitioner that he was free to leave,
> that factor does not, in and of itself, determine that a seizure has occurred;
> however, it is a factor that we consider within the totality of the circumstances
> analysis as to whether he was in fact seized."

(Emphasis supplied).

In holding that the police-citizen encounter in that case was only a mere accosting that

did not involve a Fourth Amendment seizure of the person, the Supreme Court in United

States v. Mendenhall, 446 U.S. at 558-59, gave heavy significance to the fact that the

detainee was twice expressly advised that she was free not to accede to the police request

for a consensual search.

> "[I]t is especially significant that the respondent was twice expressly
> told that she was free to decline to consent to the search, and only thereafter
> explicitly consented to it. Although the Constitution does not require 'proof
> of knowledge of a right to refuse as the sine qua non of an effective consent
> to a search,' such knowledge was highly relevant to the determination that
> there had been consent. And, perhaps more important for present purposes, the
> fact that the officers themselves informed the respondent that she was free to
> withhold her consent substantially lessened the probability that their conduct
> could reasonably have appeared to her to be coercive."

(Emphasis supplied) (citations omitted).

In Florida v. Royer, 460 U.S. at 503, by contrast, the failure to give such advice was

a factor in deciding that Royer had been seized:

> "Royer was never informed that he was free to board his plane if he so chose,
> and he reasonably believed he was being detained."

- 43 -

(Emphasis supplied).

In this case, of course, neither the appellant nor Chinham was ever advised that he was free to leave the scene. If this had been intended to be (as it probably was) a true traffic stop or other investigative stop, such advice would not have been correct and would not have been called for. In deciding which type of encounter we are dealing with, however, the absence of such advice, albeit only a factor, is a significant factor. In this case, moreover, all of the factors are pointing in the same direction.

## G. Acquiescence Is Not Necessarily Consent

In this case, both the appellant and Chinham complied with whatever Officer Kimmett asked them to do. When an officer is in a dominant position and a citizen is in a servient position, however, acquiescence is by no means the same as voluntary consent. In Swift v. State, 393 Md. at 158, the Court of Appeals noted:

> "Under the circumstances presented herein, we conclude that petitioner yielded to the authority of the police and did not voluntarily consent to Deputy Dyke's requests."

(Emphasis supplied). Thus the appellant's acquiescence is not a factor to be considered in assessing whether he felt free to leave.

## H. The Call For Back-Up

In terms of whether the appellant felt free to leave his seat in the Honda, the pièce de résistance is Officer Kimmett's call for "back-up." In assessing the tone and mood of a police-citizen encounter, a call for reinforcements is quintessentially confrontational. In a

- 44 -

voluntary and consensual conversation between equals, what possible need would either party have for back-up? It belies the very rationale of a mere accosting.

Officer Kimmett testified that as she was receiving Chinham's driver's license, she noticed the appellant sitting in the front passenger seat. Immediately upon becoming aware that she was outnumbered, she froze the scene and called for back-up. She testified that she did not remember how long it took for Officer Wintjen to arrive on the scene but that it was "not very long at all." Inevitably, however, it took some discernable amount of time.

It was not until Officer Wintjen had arrived on the scene that Officer Kimmett felt comfortable in walking over to the passenger's side of the Honda and asking for the appellant's driver's license. What happened in that awkward interim as the threesome awaited the arrival of Officer Wintjen? Did three people just freeze in place and stare at each other? The purpose of a mere accosting, of course, is for the police to engage in a conversation and to ask questions of a citizen. If this was, indeed, an accosting that had such a purpose, why did not Officer Kimmett begin the conversation while they were all standing or sitting there, waiting for the back-up to arrive? What incidentally was the intended purpose of the conversation? We are afforded no suggestion.

The State's response, of course, is that calling for back-up and waiting for back-up is simply a necessary precaution for officer safety. That may be true, in the case of a Terry-stop but the State has expressly disclaimed this as a Terry-stop. Our response to the need for

such a precautionary tactic is what we said in similar circumstances in Graham v. State, 146 Md. App. 327, 367, 807 A.2d 75 (2002):

> "It is, of course, reasonable for a police officer on the street to act with tactically wise precaution at all times. No one gainsays that. The unavoidable consequence of such sound tactics, however, is the inevitable risk that the well-advised use of precautionary tactics may, by way of direct proportion, bring an encounter within the notice of the Fourth Amendment. The fiction is that one can enjoy the prerogative of police status without assuming the concomitant burden, but one comes with the other. Sound tactics are eminently sound, but they do have a price."

(Emphasis supplied).

What the State finds difficult to acknowledge is that it wants this to have been a Terry-stop for the limited purpose of justifying police protective measures but wants it not to have been a Terry-stop in terms of requiring the Terry-level of justification. It wants the best of both worlds.

The Fourth Amendment recognizes a critical distinction between the police stopping of an individual based on a reasonable suspicion that that person may be engaged in criminal conduct and the police approaching a citizen when there is no legally cognizable reason to believe that that person has committed any criminal infraction. Invoking the mantra of police protection will not be allowed to obscure that critical difference. In the crime-related context of a Terry-stop, including a traffic stop, the police are permitted (nay, encouraged) to "control the scene." Pennsylvania v. Mimms, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); Maryland v. Wilson, 518 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997); Brendlin v. California, 551 U.S. 249, 127 S.Ct. 1400, 168 L.Ed.2d 132 (2007); Arizona v. Johnson,

555 U.S. 323, 129 S. Ct. 781, 172 L.Ed.2d 694 (2009). The desirability of controlling the scene necessitates the assertion of police authority. The Supreme Court language about the desirability of the "police controlling the scene," significantly, was not uttered in the context of a mere consensual accosting.

In the mere accosting, by dramatic contrast, the citizen enjoys just as much control over the scene as does the officer. Either may terminate the encounter and walk away without the permission of the other. Neither exercises control over the other, which means that neither controls the scene. The officer does not enjoy the benefit of Fourth Amendment-sanctioned authority (even in the name of police protection) unless the officer possesses the Fourth Amendment justification of reasonable articulable suspicion that he may be dealing with a criminal. The exercise of police authority requires a Fourth Amendment predicate. You don't get one without the other.

In a truly egalitarian accosting where both parties enjoy equal rights, what precautionary measures for instance, might the citizen take? Call for back-up? Frisk the police officer? Order the officer to alight from his vehicle? In a true consensual accosting, neither party, of course, may do any of these things. When the circumstances do not obligate the officer to make a Fourth Amendment-implicated intrusion in the first instance, the available precautionary and protective measure is both obvious and unoffending. It is simply to avoid the gratuitous encounter if it seems too threatening.

What, moreover, would the impact of this surrealistic freezing of the action have been on a reasonable person's perception of his freedom to get out of the car and walk away? If back-up were needed to make it safe for Officer Kimmett even to approach the appellant, would the appellant have felt free to get out of the Honda and to walk around to the other side of it? Would the appellant have been permitted to go anywhere that might have positioned him <u>behind</u> Officer Kimmett? The very circumstances that caused her to call for back-up would have compelled her to forbid the appellant from getting behind her. Police routinely seize the weather gauge when confronting a suspect. To call this eery tableau, frozen for some dramatic fragment of time, a voluntary and consensual encounter is unreal. The appellant and Chinham were locked in place at police command, explicit or implicit. To pretend it was anything else is a charade.

If in <u>Swift v. State</u> the citizen felt compelled to wait for the result of the warrant check, the appellant here was similarly compelled to wait for the arrival of back-up? The appellant's presence at the scene, after all, was the very reason for calling for back-up. Part of Judge Meredith's dissent that <u>Swift</u>, 393 Md. at 155, quoted with approval, was:

> "<u>The implied requirement that Swift was to wait</u> for the results of the warrant check adds weight to the other circumstances <u>suggesting that Swift was not free to go about his business</u>."

(Emphasis supplied).

## The Totality of the Circumstances

Looking at all of the circumstances, we do not hesitate to hold that the appellant, as Officer Kimmett moved around to his passenger window and requested his driver's license, was being subjected to a Fourth Amendment seizure of his person without the required Fourth Amendment justification. Officer Kimmett's smell of raw marijuana at that time and place was the fruit of that poisonous tree. The physical evidence should have been suppressed.

We hasten to reaffirm that we are not being critical of Officer Kimmett's behavior. It is clear to us that she approached the scene as if she were conducting a Terry-level investigative stop and not a mere accosting. Her actions were in complete accord with what an officer's actions should be in conducting a Terry-stop. The flaw, of course, is that a Fourth Amendment predicate had not been established for conducting such a Terry-stop. The State's effort to justify the encounter as something less than an investigative stop is an afterthought.

## Conclusion

It is constitutionally permissible, and indeed desirable, that the police react in a professionally authoritarian fashion and exercise firm control over the scene of a police-citizen encounter, whenever the police have at least a Terry-level reasonable suspicion that a crime (including a traffic offense) has occurred. Where, on the other hand, such Fourth Amendment justification is lacking, such authoritarian behavior may be completely

inappropriate. As far as intellectual honesty is concerned, moreover, it is with ill grace that the police should behave in an authoritarian manner but then pretend that the encounter was innocuously egalitarian. It is necessary to recognize the level of police-citizen encounter that is called for in a given situation and then to adapt the police behavior accordingly. One size does not fit all. Overly authoritarian police behavior can ipso facto transform what might otherwise be an innocuously consensual police-citizen conversation into a full-fledged constitutional encounter.

**JUDGMENT REVERSED; COSTS TO BE PAID BY HOWARD COUNTY.**